1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   R.H., a minor, by and through        No. 2:20-cv-01435 WBS DMC
     her guardian ad litem, Sheila
13   Brown; ESTATE OF ERIC JAY HAMES,
     by and through its personal
14   representative, Crystal Dunlap        MEMORANDUM AND ORDER RE:
     Bennett,                              DEFENDANTS' MOTION FOR
15                                         SUMMARY JUDGMENT
                   Plaintiffs,
16
          v.
17
     CITY OF REDDING, a public
18   entity; JOE ROSSI, an
     individual; KIP KINNEAVY, an
19   individual; JAY GUTERDING, an
     individual; BRETT LEONARD, an
20   individual; and DOES 5 through
     20 inclusive,
21
                   Defendants.
22

23                         ----oo0oo----

24          Plaintiffs R.H., a minor, by and through her guardian

25   ad litem, and the Estate of Eric Jay Hames, by and through its

26   personal representative, brought this action, alleging violations

27   of federal and state law, against the City of Redding ("the

28
                                   1

1   City"), and City of Redding police officers Joe Rossi ("Rossi"),

2   Kip Kinneavy ("Kinneavy"), Jay Guterding ("Guterding"), and Brett

3   Leonard ("Leonard").  This suit arises from the fatal shooting of

4   Eric Hames by Rossi, Kinneavy, Guterding, and Leonard.  The

5   complaint contains claims for: (1) excessive force in violation

6   of the Fourth Amendment, 42 U.S.C. § 1983, (2) unwarranted

7   interference with the right to familial association in violation

8   of the Fourteenth Amendment, 42 U.S.C. § 1983, (3) municipal

9   liability under Monell v. Department of Social Services, 436 U.S.

10  658 (1978),[1] (4) battery, (5) violation of the Tom Bane Civil

11  Rights Act, Cal. Civ. Code § 52.1, and (6) negligence.  Before

12  the court is the defendants' motion for summary judgment.

13  (Docket No. 29.)

14  I.   Factual Background

15          On August 27, 2018, Rossi was on patrol and heard a

16  call over the police radio about a man, later identified as

17  Hames, who was in the middle of the roadway obstructing traffic

18  at an intersection in Redding, California.  (Pls.' Resp. to

19  Defs.' Statement of Undisputed Facts ("DSUF") at No. 1 (Docket

20  No. 31); Defs.' Resp. to Pls.' Statement of Undisputed Facts

21  ("PSUF") at No. 1 (Docket No. 35).)  Dispatch services for the

22  police department had received multiple calls about Hames stating

23  he was "jumping in front of cars," and "yelling and spitting on

24  passing vehicles."  (Decl. of Maria Nozzolino ("Nozzolino

25  Decl."), Ex. A of Ex. D (Decl. of Chris Smyrnos) at 4. (Docket

26  _____

27          [1]   In opposition to defendants' motion, plaintiffs have
    withdrawn their Monell liability claim against the City of
    Redding.  (Pls.' Opp'n at 16 (Docket No. 30).)  Therefore, the

28  court will not address it in this order.

1  No. 29-3).)

2          Rossi arrived at the intersection and observed Hames

3  throw a glass bottle in the air, yell incomprehensibly, and take

4  a six-inch knife out from a sheath on his belt.  (DSUF at No. 3;

5  PSUF at Nos. 2-3; Decl. of Neil Gehlawat (Gehlawat Decl.), Ex. C,

6  Video Summary of Subject Shooting (Docket No. 32).)  Hames,

7  initially positioned closer to the passenger side of Rossi's

8  patrol vehicle, moved no closer than 10 feet away from Rossi's

9  driver side door.  (PSUF at Nos. 4-5.)  Over the PA system, Rossi

10 told Hames to put the knife down and Hames did not comply.  (DSUF

11 at No. 5.)  Rossi's initial encounter with Hames lasted

12 approximately 30 seconds to one minute before Hames ran in the

13 direction of a nearby shopping center.  (PSUF at No. 7.)

14         Rossi followed Hames in his patrol vehicle and

15 communicated over the dispatch radio, alerting other units that

16 Hames was armed with a knife and had fled into the shopping

17 center.  (DSUF at No. 8; PSUF at No. 9.)  Rossi encountered Hames

18 at the back of a Domino's Pizza building alongside Larkspur Lane

19 and exited his patrol vehicle with his handgun drawn.  (PSUF at

20 No. 10.)  Guterding, Leonard, and Kinneavy arrived within seconds

21 and joined Rossi in a semi-circle around Hames, with their

22 handguns drawn, as Hames stood near two AC units at the back of

23 the building with his arms crossed and the knife in his hand.

24 (DSUF at No. 12; Gehlawat Decl., Ex. C.)  Kinneavy turned back

25 and retrieved a shotgun from his nearby parked patrol vehicle.

26 (DSUF at No. 14; Gehlawat Decl., Ex. C.)

27         Rossi and Kinneavy gave Hames verbal commands to drop

28 the knife.  (DSUF at No. 15.)  Hames walked three steps from the

3

AC unit in the direction of Guterding, with the knife still in
his hand and his arms crossed.  (See id. at No. 17; PSUF at No.
28; Gehlawat Decl., Exs. A and B, videos of shooting.)  Rossi,
Guterding, Kinneavy, and Leonard shot Hames.  (DSUF at Nos. 18-
21; Gehlawat Decl., Exs. A and B.)  Rossi fired two or three
shots, Guterding fired three shots, Kinneavy fired four rounds
from his shotgun, and Leonard fired one shot.  (PSUF at Nos. 14,
15, 34, 40.)

Hames was 23 feet, 10 inches from Guterding and more
than 15-20 feet from Leonard when he was shot, though the
officers' recollections place Hames at a closer distance.
(Gehlawat Decl., Ex. C.; DSUF at Nos. 18-21.)  Approximately 60
seconds passed from the time Rossi encountered Hames at the
Domino's Pizza to the time he was shot.  (Gehlawat Decl., Ex. C.)

II.  <u>Legal Standard</u>

Summary judgment is proper "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  The party moving for summary judgment bears the
initial burden of establishing the absence of a genuine issue of
material fact and can satisfy this burden by presenting evidence
that negates an essential element of the non-moving party's case.
See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).
Alternatively, the movant can demonstrate that the non-moving
party cannot provide evidence to support an essential element
upon which it will bear the burden of proof at trial.  <u>Id.</u>  If
the moving party has properly supported its motion, the burden
shifts to the non-moving party to set forth specific facts to

1   show that there is a genuine issue for trial.  See id. at 324.

2   Any inferences drawn from the underlying facts must, however, be

3   viewed in the light most favorable to the party opposing the

4   motion.  See Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.,

5   475 U.S. 574, 587 (1986).

6   III. Qualified Immunity on Plaintiffs' Federal Claims

7            In actions under 42 U.S.C. § 1983, the doctrine

8   of qualified immunity "protects government officials 'from

9   liability for civil damages insofar as their conduct does not

10  violate clearly established statutory or constitutional rights of

11  which a reasonable person would have known.'"  Pearson v.

12  Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald,

13  457 U.S. 800, 818 (1982)).  Qualified "immunity protects all but

14  the plainly incompetent or those who knowingly violate the law."

15  White v. Pauly, 137 S. Ct. 548, 551 (2017) (quotations omitted).

16           The court has carefully reviewed the evidence submitted

17  by both parties, which includes video exhibits showing the

18  entirety of the encounter at multiple angles, depositions, and

19  expert reports.  (See Gehlawat Decl., Exs. A-C.)  Based on the

20  evidence and the existing case law, the court cannot conclude

21  that the officers' acted in a manner that was "plainly

22  incompetent" or "knowingly violat[ing] the law."  See White, 137

23  S. Ct. at 551.

24           To determine whether an officer is entitled

25  to qualified immunity, the court considers: (1) whether there has

26  been a violation of a constitutional right; and (2) whether the

27  officers' conduct violated "clearly established" federal

28  law.  See Sharp v. Cnty. of Orange, 871 F.3d 901, 909 (9th Cir.

1   2017) (citing Kirkpatrick v. Cnty. of Washoe, 843 F.3d 784, 788

2   (9th Cir. 2016)).  The court has the discretion to decide which

3   prong of qualified immunity to address first and, if analysis of

4   one prong proves dispositive, the court need not analyze the

5   other.  See Pearson, 555 U.S. at 236.  Here, the court will

6   exercise its discretion to analyze the second prong first:

7   whether the officers' conduct violated a clearly established

8   right.

9        The clearly established inquiry "serves the aim of

10  refining the legal standard and is solely a question of law for

11  the judge."  Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d

12  1075, 1085 (9th Cir. 2009).  The Supreme Court has noted that the

13  law "does not require a case directly on point for a right to be

14  clearly established, [but] existing precedent must have placed

15  the statutory or constitutional question beyond debate."  White,

16  137 S. Ct. at 551 (quotations and citations omitted).

17       When determining whether the right at issue has been

18  clearly established, the court may not "define clearly

19  established law at a high level of generality."  See Kisela v.

20  Hughes, 138 S. Ct. 1148, 1152 (2018) (quoting Ashcroft v. Al-

21  Kidd, 563 U.S. 731, 742 (2011)).  Rather, "the clearly

22  established law at issue must be particularized to the facts of

23  the case."  White, 137 S. Ct. at 552.  This is particularly

24  important in excessive force cases because "[i]t is sometimes

25  difficult for an officer to determine how the relevant legal

26  doctrine, here excessive force, will apply to the factual

27  situation the officer confronts."  Mullenix v. Luna, 136 S. Ct.

28  305, 308 (2015).

1    With the framework above in mind, the court analyzes

2  whether the law was clearly established such that reasonable

3  officers on August 27, 2018 would have known that the use of

4  deadly force is unreasonable against an armed suspect who was

5  acting erratically, had ignored commands, fled from an initial

6  encounter with an officer, moved toward an officer with a knife

7  in hand, and caused the officers to fear for their safety.

8    The case in which the court finds the circumstances to

9  be most analogous to those here is Kisela v. Hughes, 138 S. Ct.

10  1148 (2018).  In Kisela, officers responded to reports of a woman

11  with a knife acting erratically in a neighborhood.  Id. at 1151.

12  Upon arrival, the officers saw the suspect come out of the home

13  with a large kitchen knife, and stand within six feet, and

14  "striking distance," of another woman.  See id. at 1151, 1154.

15  There, as here, the suspect did not hold up the knife or run

16  toward anyone but ignored the officers' orders to drop the

17  weapon.  Id. at 1151.  There, as here, the officers shot the

18  suspect within a minute of arriving on the scene.  Id.  The

19  Supreme Court reversed the district court's denial of qualified

20  immunity because the law was not clearly established that the use

21  of deadly force in such a situation violated the decedent's

22  constitutional rights.  Id. at 1154-55.

23    Given the similarity to the facts in Kisela, decided

24  just four months prior to the incident here, the court concludes

25  that reasonable officers would not have been put on notice that

26  use of deadly force in the instant case was unreasonable.  Though

27  the distance between Hames and the officers was greater than the

28  six feet in Kisela, there is no clearly established law from the

7

1   Ninth Circuit or the Supreme Court that establishes a minimum

2   distance between the suspect and the officers before they are

3   justified in using deadly force.

4           Courts do take the distance between the suspect and the

5   officers into account when evaluating the totality of the

6   circumstances.  For example, although it was decided after the

7   incident in this case, in Ventura v. Rutledge, 978 F.3d 1088 (9th

8   Cir. 2020), the court concluded the officer was entitled to

9   qualified immunity where the officer shot a suspect who was 10-15

10  feet away.  Id. at 1090.  The officer had received domestic

11  violence related reports about the suspect and the suspect was

12  armed with a knife, ignoring commands, and advancing toward the

13  officer.  Id.  The court determined there was no clearly

14  established law demonstrating the officer's use of deadly force

15  was unconstitutional.  Id. at 1092.  The 23 feet and 10 inches

16  between the officers and Hames is relatively close in range to

17  the distance in Ventura.  Accord Buchanan v. City of San Jose,

18  782 F. App'x 589 (9th Cir. 2019) (holding officers did not use

19  excessive force when they shot a man armed with a knife who was

20  55 feet away and advancing toward the officers).

21          The court's finding of qualified immunity is further

22  supported by Blanford v. Sacramento County, 406 F.3d 1110 (9th

23  Cir. 2005).  Blanford involved a man whom officers, after

24  receiving several reports about, observed walking through a

25  neighborhood with a sword and behaving erratically.  Blanford,

26  406 F.3d at 1112.  As in the instant case, the man failed to heed

27  warnings or commands.  See id. at 1112-13; (DSUF at No. 16.)  The

28  man eventually tried to enter a home through the front door and

8

then through the backyard.  Id. at 1113.  Officers believed the man posed an imminent threat to anyone that could be in the home or the backyard, though he had never advanced toward the officers.  Id.  The officers shot the man multiple times as he tried to enter the home.  Id. at 1113-14.  Only later did the officers learn that he was trying to enter his own home and did not hear the officers because he had headphones in.  Id. at 1112-14.  The Ninth Circuit concluded the use of deadly force did not violate the Fourth Amendment.  Id. at 1119.

Hames posed at least as much of a threat as the man in Blanford.  Hames had ignored multiple commands to drop his knife and had fled from his initial encounter with Rossi.  Unlike the officers in Blanford who were uncertain if anyone was even in the home when the man began to enter, here, the officers observed Hames moving toward one of them with his knife.  The circumstances here could be viewed by a reasonable officer as more threatening.

Plaintiffs bear the burden of "proving that the right allegedly violated was clearly established at the time of the official's allegedly impermissible conduct."  Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993).  Plaintiffs primarily rely on three cases — Tennessee v. Garner, 105 S. Ct. 1694 (1985), Glenn v. Washington County, 673 F.3d 864 (9th Cir. 2011), and Espinosa v. City of San Francisco, 598 F.3d 528 (9th Cir. 2010) — to further their argument against qualified immunity.  However, these cases are insufficient to put reasonable officers in these circumstances on notice that their conduct was violating clearly established law.

1    The leading case of Tennessee v. Garner simply sets out

2  the general proposition that when a law enforcement officer is

3  pursuing a fleeing suspect the officer may not use deadly force

4  unless the officer has probable cause to believe the suspect

5  poses a significant threat of death or serious physical injury to

6  the officer or others. Garner, 105 S. Ct. at 1697.  It does not

7  speak to any set of circumstances similar to those presented in

8  this case.  To the contrary, the facts here differ significantly

9  from the conduct the Supreme Court found to be unconstitutional

10 in Garner, which involved the shooting of a clearly unarmed

11 suspect in the back of the head while he was running away from

12 the officers.  Id.

13    In Glenn, officers responded to a call from family

14 members and friends about an intoxicated, suicidal teenager

15 standing outside his home.  Glenn, 673 F.3d at 867.  The teen was

16 holding a pocketknife to his own neck and would not drop it, but

17 was not threatening anyone else.  Id. at 873.  While the teenager

18 stood still, one of the officers fired beanbag rounds at him.

19 Id. at 869.  As he was being hit with the beanbag rounds, the

20 teenager took one or two steps toward the home, in which his

21 parents remained, and the officers fired 11 shots at him.  Id. at

22 879.  The Ninth Circuit reversed the grant of summary judgment

23 for the Glenn defendants and determined that there were material

24 questions of fact that precluded a conclusion that the force used

25 by the officers, the beanbag rounds and the deadly force, was

26 reasonable as a matter of law.  Id. at 879-80.  This case is

27 distinguishable from Glenn in that Hames was not a threat just to

28 himself, as the teen was in Glenn, but posed an immediate threat

1   to the officers.  Hames was advancing toward Guterding with a

2   knife and not standing still like the teenager in <u>Glenn</u>.

3          Plaintiffs' reliance on <u>Espinosa</u> is also insufficient.

4   In <u>Espinosa</u>, officers used deadly force in an attempt to make an

5   arrest of an unarmed suspect who was hiding in an attic and

6   resisting arrest when officers searched a home.  <u>Espinosa</u>, 598

7   F.3d at 533.  The Ninth Circuit affirmed the district court's

8   denial of qualified immunity because there was evidence that the

9   officers' initial entry into the premises violated the occupant's

10  Fourth Amendment right and that such illegal entry provoked the

11  confrontation which resulted in the shooting.  <u>Id.</u> at 539.  Here,

12  unlike in <u>Espinosa</u>, there is no suggestion that the officers

13  improperly on the scene or that they did anything to provoke

14  Hames' conduct, and they were not approaching an unarmed suspect,

15  rather one who was indisputably armed with a knife.

16         Even if the officers were mistaken about whether Hames

17  was going to harm them, the reasonableness inquiry recognizes

18  "that it is inevitable that law enforcement officials will in

19  some cases reasonably but mistakenly conclude" that their conduct

20  comports with the Constitution and thus shields officials from

21  liability when their mistake is reasonable.  <u>See</u> <u>Anderson v.</u>

22  <u>Creighton</u>, 483 U.S. 635, 641 (1987).  Given the precedent

23  outlined above, the court concludes that at the time of the

24  shooting, a reasonable officer in these circumstances would not

25  have known that he was violating Hames' constitutional rights.

26  To the contrary, clearly established law would signal to a

27  reasonable officer that it was permissible to use deadly force in

28  these circumstances.

1    Accordingly, the court will grant summary judgment to

2  defendants Rossi, Kinneavy, Guterding, and Leonard on the Fourth

3  and Fourteenth Amendment claims on the ground of qualified

4  immunity.[2]

5  IV.  State Law Claims

6    Because the court will grant summary judgment for

7  defendants on plaintiffs' federal claims, the court no longer has

8  federal question jurisdiction, and there is no suggestion that

9  there is diversity jurisdiction in this case.  Federal courts

10 have "supplemental jurisdiction over all other claims that are so

11 related to claims in the action within such original jurisdiction

12 that they form part of the same case or controversy under Article

13 III of the United States Constitution."  28 U.S.C. § 1367(a).  A

14 district court "may decline to exercise supplemental jurisdiction

15 . . . [if] the district court has dismissed all claims over which

16 it has original jurisdiction."  28 U.S.C. §

17 1367(c); see also Acri v. Varian Assocs., Inc., 114 F.3d 999,

18 1001 n.3 (9th Cir. 1997) (en banc) (explaining that a district

19 court may decide sua sponte to decline to exercise supplemental

20 jurisdiction).

21    The Supreme Court has stated that "in the usual case in

22 which all federal-law claims are eliminated before trial, the

23 balance of factors to be considered under the pendent

24 jurisdiction doctrine – judicial economy, convenience, fairness

25 and comity – will point toward declining to exercise jurisdiction

26 _____

27   [2]   Because the court determines the defendants are
   entitled to qualified immunity based on the second prong of the
   analysis, it does not address whether plaintiffs' constitutional
28 rights have been violated.

                                    12

1   over the remaining state-law claims."  <u>Carnegie-Mellon Univ. v.</u>
2   <u>Cohill</u>, 484 U.S. 343, 350 n.7 (1988).

3        Here, comity strongly weighs in favor of declining to
4   exercise supplemental jurisdiction over plaintiffs' state law
5   claims.  The state courts are fully competent to adjudicate such
6   claims.  Some of plaintiffs' claims raise particularly complex
7   questions of state law, such as the Tom Bane Civil Rights Act,
8   which are better left for California courts to resolve.

9        As for judicial economy, plaintiffs' state law claims
10  have not been the subject of any significant litigation in this
11  case, as this is the first instance in which the merits of
12  plaintiffs' claims are being considered.  Judicial economy does
13  not weigh in favor of exercising supplemental jurisdiction.  And
14  finally, convenience and fairness do not weigh in favor of
15  exercising supplemental jurisdiction over plaintiffs' remaining
16  state law claims.  The federal and state fora are equally
17  convenient for the parties.  There is no reason to doubt that the
18  state court will provide an equally fair adjudication of the
19  issues.  There is nothing to prevent plaintiffs from refiling
20  their state law claims against defendants in state court, and any
21  additional cost or delay resulting therefrom should be minimal.[3]
22  Accordingly, the court declines to exercise supplemental
23  jurisdiction and will dismiss plaintiffs' remaining state law

24  _____

25       [3]    "[T]he period of limitations for any claim asserted
     under [28 U.S.C. § 1367(a)], and for any other claim in the same
26   action that is voluntarily dismissed at the same time or after
     the dismissal of the claim under subsection (a), shall be tolled
27   while the claim is pending and for a period of 30 days after it
     is dismissed unless State law provides for a longer tolling
28   period." 28 U.S.C. § 1367(d).

1    claims without prejudice to refiling in state court.

2           IT IS THEREFORE ORDERED that defendants' motion for

3    summary judgment (Docket No. 29) be, and the same hereby is,

4    GRANTED on the ground of qualified immunity on plaintiffs'

5    federal claims under 42 U.S.C. § 1983 against defendants Rossi,

6    Kinneavy, Guterding, and Leonard.

7           IT IS FURTHER ORDERED that plaintiffs' remaining state

8    law claims against defendants be, and the same hereby are,

9    DISMISSED WITHOUT PREJUDICE to refiling in state court.

10          The Clerk shall enter Judgment in favor of all

11   defendants in accordance with this Order.

12   Dated:  February 10, 2022

13                                  WILLIAM B. SHUBB
                                    UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    14